IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No.  10-cv-00282-MSK-MEH

DEMARCO JAMAAL WHITE,

        Petitioner,

v.

ANGEL MEDINA, Warden, L.C.F., and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

        Respondents.

---

## AMENDED OPINION AND ORDER DENYING AMENDED PETITION

---

**THIS MATTER** comes before the Court pursuant to Mr. White's Amended Petition **(#7)** for a writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254, the Respondents' Response **(# 15)**, and Mr. White's reply **(# 17)**.

On May 11, 2011, this Court issued an Opinion and Order **(# 22)** denying Mr. White's Amended Petition.  That Opinion recited the observation that, in response to the Court's order directing the parties to produce the state court record **(# 14)**, the parties had submitted only the state court briefing, not trial transcripts or other material.  Accepting the implicit representation that this comprised the only available state court record, this Court proceeded to analyze Mr. White's claims on the record supplied, deriving its factual findings from the parties' briefing and the findings by the Colorado Court of Appeals.  On that record, this Court denied Mr. White's Amended Petition and Mr. White appealed.  By Order dated September 9, 2011, the 10th Circuit remanded **(# 31)** the matter to this Court.  The 10th Circuit observed that a full state court record

1

had been filed with this Court[1] and directed that this Court again review Mr. White's claims, this time with the benefit of the full state court record.

Consistent with the 10th Circuit's instruction, the Court has reviewed the full state court record and had re-evaluated Mr. White's claims mindful of that record. Upon such review, this Court reaches the same conclusions as in its May 2011 Order, for the same reasons. For the convenience of the parties and the 10th Circuit, the Court sets forth those findings and conclusions in their entirety in this Amended Opinion and Order (with certain modifications in the factual recitations and/or analysis to address additional information gleaned from review of the full state court record).

---

[1]Although the 10th Circuit did not request an explanation for the disparity between this Court's May 11, 2011 Opinion and the then-existing docket entry noting the filing of the full state court record, this Court believes that both the parties and the 10th Circuit are entitled to such an explanation. Internal chambers records indicate that the undersigned signed a draft of the Opinion on or about January 26, 2011. A miscommunication among chambers staff resulted in the signed order not being promptly submitted to the Clerk's Office for filing and mailing.

In May 2011, a chambers review of open cases revealed that the January 2011 Opinion had not been docketed and this case remained open. The Court immediately re-dated and re-signed the previously-approved Opinion and submitted it to the Clerk's Office. In doing so, the Court neglected to examine the docket to ascertain whether there had been additional developments in the case since January 2011. (Given that substantive briefing on Mr. White's Amended Petition was complete as of June 2010, the Court simply assumed that additional docket activity after January 2011 would be aberrant.)

Unbeknownst to the undersigned, the Magistrate Judge had independently conducted a review of pending *habeas* cases in or about March 2011 and ascertained that the full state court record had not been filed here. Thus, the Magistrate Judge issued the March 22, 2011 Order (**# 19**) directing filing of the state court record. For reasons that remain unknown to the Court, this Magistrate Judge's Order was more efficacious than the Court's own April 6, 2010 Order (**# 14**) in obtaining production of the full state court record. Nevertheless, because the Court did not independently review the docket before (re-)issuing the Opinion in May 2011, it overlooked the fact that the full state court record had since been filed.

2

## **FACTS**

The Court will briefly summarize the background facts here, and elaborate where necessary as part of its analysis.  In March 2002, Mr. White and Bodashon Wilkins went to the home of Donzell Jenkins and Samuel Knox for the purpose of selling some crack cocaine.  While at the home, Mr. White fatally shot Mr. Jenkins and Mr. Knox.  Mr. White was charged with two counts of first degree murder, C.R.S. § 18-3-102(1)(a), and one count of conspiracy to commit murder, C.R.S. § 18-3-201.  Mr. White was jointly tried with Mr. Wilkins in 2004.  At the trial, the Government contended that Mr. White acted without provocation, arguing that Mr. White sought to retaliate against Mr. Jenkins and Mr. Knox for stealing drugs or money from him earlier.  Mr. White contended that Mr. Jenkins and Mr. Knox summoned him to the home with the intent of robbing him and menaced him with weapons, forcing him to act in self-defense.

The jury convicted Mr. White of one count of first degree murder (involving Mr. Knox), and the lesser offense of second degree murder (involving Mr. Jenkins), and acquitted him of the conspiracy count.  Mr. White was sentenced to life imprisonment without parole on the first degree murder charge and a consecutive sentence of 48 years on the second degree murder count.

In the instant Amended petition **(# 7)**, Mr. White raises 11 claims: (i) denial of his 6th Amendment right to assistance of counsel, in that his assigned counsel labored under a conflict of interest and provided ineffective assistance by failing to investigate and present exculpatory evidence; (ii) deprivation of Due Process, in that the trial court refused jury instructions tendered by Mr. White or gave incomplete and abbreviated versions of those instructions, including an instruction on necessity/self-defense; (iii) denial of his 6th Amendment right to trial by jury and

3

his right to Due Process, in that the trial court failed to adequately address a note from a

dissenting juror claiming to be "picked on" by other jurors; (iv) deprivation of Due Process, in

that the trial court erroneously admitted evidence of Mr. White's prior felony conviction, which

Mr. White claims was obtained unconstitutionally; (v) deprivation of Due Process, in that Mr.

White was tried with his co-defendant, Mr. Wilkins, whose defense was antagonistic to that

presented by Mr. White; (vi) denial of his 6th Amendment right to trial by jury and his right to

Due Process, in that the trial court denied Mr. White's challenges to four jurors for cause (thus

requiring Mr. White to use peremptory challenges to remove those jurors and preventing him

from removing other "biased jurors"); (vii) deprivation of Due Process by the trial court in

allowing the admission of "extremely prejudicial photographs" of the victims which, Mr. White

contends, did not accurately depict the victim's locations and positions; (viii) deprivation of Due

Process, in that the trial court permitted the Government to make prejudicial remarks in its

closing argument; (ix) deprivation of Due Process, in that there was insufficient evidence in the

record to support the jury's verdict; (x) that the cumulative effect of the errors discussed above

operated to deprive Mr. White of Due Process; and (xi) ineffective assistance of trial counsel in

violation of the 6th Amendment, in that trial counsel failed to present exculpatory evidence that a

victims' girlfriend had altered or concealed evidence prior to the police's arrival and failed to

properly challenge the introduction of his prior conviction.

 The Respondent concedes that the Amended Petition is timely and properly-exhausted.

## ANALYSIS

### A.  Standard of review

 A *habeas* petition under § 2254 examines whether the petitioner's state court conviction

4

was obtained in violation of provisions of the United States Constitution.  28 U.S.C. § 2254(d); *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Specifically, federal courts may not grant a writ unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d).  This Court is generally not concerned with questions of fact decided by the state trial jury or state courts, sufficiency of the evidence against the petitioner, or questions of whether the state court properly applied state law, except to the extent  that such alleged errors implicates rights guaranteed by the U.S. Constitution.  *Id.*  at 400-01.  As a result, the Court presumes factual findings by the state courts to be correct, and the petitioner is required to come forward with clear and convincing evidence to overcome such presumption.  28 U.S.C. § 2254(e)(1).

In considering Mr. White's filings, the Court is mindful of his *pro se* status, and accordingly, reads his pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, such liberal construction is intended merely to overlook technical formatting errors and other defects in his use of legal terminology and proper English.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve Mr. White of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court treats Mr. White according to the same standard as counsel licensed to practice law before the bar of this Court.  *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

## B.  Claims

The Court addresses Mr. White's claims *seriatim*. With regard to each claim, the Court first notes the articulation of the claim as found in the Amended Petition, then examines the relevant facts (including, where appropriate, Mr. White's contentions that the state court's factual findings are in error)[2] and then considers Mr. White's particular arguments in support of the claim (those arguments are usually those found in his Traverse, rather than in the relatively sparse allegations of the Amended Petition).

### 1. Ineffective assistance of counsel

Mr. White contends that his trial counsel rendered ineffective assistance to him in two respects. First, he contends that his counsel labored under a "conflict of interest" with him. Mr. White's Amended Petition does not elaborate on this allegation, but his Traverse explains that "counsel was operating under conflict because she had failed to meet with him, investigate possible defenses, and/or [present] exculpatory evidence which would support his claims of self-defense [as well as] feigned ignorance of these issues when confronted with them by the Court." Second, Mr. White contends that his counsel "failed to investigate, prepare, communicate, forensically test exculpatory evidence, etc." It appears to the Court that these two allegations are one and the same – that is, that his counsel failed to investigate and present (unspecified) exculpatory evidence and otherwise failed to effectively communicate with Mr. White.

### A. Facts

The Colorado Court of Appeals' August 16, 2007 decision recited the following factual findings with regard to the ineffective assistance of counsel claim. Between the appointment of

---

[2]Pursuant to 28 U.S.C. § 2254(e), factual findings by the state court are presumed by this Court to be correct. Mr. White bears the burden of demonstrating, by clear and convincing evidence, that such findings are in error.

counsel in August 2002 and March 2004, Mr. White "filed three sets of motions" seeking appointment of different trial counsel.  During the same time period, his counsel filed two motions seeking to withdraw from representation.  Mr. White's motions "alleged without specificity" an inability to communicate with and a distrust of his counsel.  His counsel's motions "alleged [that] an irreconcilable conflict of interest rendered [counsel] ineffective."  The trial court conducted three separate hearings on these motions.  In the first hearing, the court rejected Mr. White's first set of motions "because they were 'boilerplate' motions with conclusory allegations of ineffective assistance."

A second hearing considered Mr. White's second motion, as well as the first motion filed by his counsel.  These motions "indicated that [Mr. White]'s 'intense distrust' effectively hindered counsel's ability to communicate with him," and that Mr. White "asserted, but could not specify, that 'certain things weren't getting done.'" At the request of the trial judge, a different judge conducted an additional hearing into the matter.   In that hearing, counsel explained that, although they were asserting "a total breakdown of communication," they were nevertheless able "to the full extent of their ability, having been impeded essentially by a client," to effectively represent Mr. White.  Thus, the trial court "concluded that counsel's inability to communicate with [Mr. White] principally stemmed from [Mr. White]'s noncooperation."  As a result, the trial court denied both motions.

The matter of counsel's effectiveness was taken up again in a third motion by Mr. White, which largely repeated his earlier motion (with some additional elaboration concerning his counsel's failure to conduct ballistics testing).  Such motion was "summarily denied."  His counsel filed a second motion to withdraw, which occasioned yet another hearing by the trial

7

court.  This time, "the court denied the motion because it was filed on the eve of trial."  After

reviewing this record, the Colorado Court of Appeals found "[no] abuse of discretion in the trial

court's rulings" denying both Mr. White and counsel's requests to withdraw.  The Court of

Appeals explained that "the record supports the trial court's conclusion that communication

difficulties were largely a result of [Mr. White]'s noncooperation."

        After his conviction was affirmed, Mr. White filed a Rule 35 motion in the trial court,

contending that his trial counsel had supplied ineffective assistance.   The trial court denied this

motion and the Colorado Court of Appeals affirmed that denial.  The Court of Appeals'

September 2009 decision explained that "the trial court denied the motion without a hearing on

the grounds that [Mr. White]'s arguments had been previously raised and rejected."  The Court

of Appeals found that although the trial court's rationale was incorrect,[3] the denial of the motion

was nevertheless appropriate.  It characterized his motion as contending that "certain crucial

information was not adequately highlighted by his attorney," who, Mr. White contends, "should

have 'hammered home' that the victim's girlfriend moved and hid the victim's gun, that

additional shell casings were found at the scene but were not tested by the firearms expert, and

that gunshot residue was found on the victims' hands."  The Court of Appeals found that "all of

this evidence was presented to the jury," if not by Mr. White's counsel, then by counsel for his

co-defendant, Mr. Wilkins.  Thus, the Court of Appeals determined, Mr. White "cannot show

how the outcome would have been different had the evidence been highlighted again."  As a

---

        [3] The Court of Appeals observed that Mr. White "previously raised similar issues, [but]
he did not do so under the purview of ineffective assistance of counsel."  Mr. White's pre-trial
complaints about his representation were couched in terms of "conflict of interest" or "inability
to communicate," not ineffective assistance.

8

result, the Court of Appeals affirmed the trial court's denial of Mr. White's Rule 35 motion, albeit on different grounds.

The Court notes that Mr. White's Amended Petition and Traverse in the instant matter do not dispute any of the purely-factual findings as set forth above; in other words, Mr. White does not dispute that the Court of Appeals' decisions properly identified the motions that were made, the arguments raised, and the grounds upon which the trial court denied them.  (In any event, this Court has independently reviewed the record of proceedings in the trial court on this matter and finds that the Court of Appeals correctly described the state of the record.)  Mr. White does disagree with the Court of Appeals' application of the law to the facts – *i.e.* the conclusion that Mr. White's co-defendant presented the same evidence that Mr. White contends his attorney should have presented, and that Mr. White could not show that the outcome of the proceeding would have been different had his attorneys discharged their duties more effectively.

B.  Analysis

Although the Colorado Court of Appeals perceived a difference between Mr. White's claims on direct appeal (*i.e.* challenges to the trial court's denial of motions to appoint substitute counsel) and the claims he raised in his Rule 35 motion (*i.e.* challenges that his attorneys provided him ineffective assistance), this § 2254 action presents the simple question of whether Mr. White's counsel's performance at trial was constitutionally-deficient.  *See Wheat v. U.S.*, 486 U.S. 153, 159 (1988) ("in evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such"); *Carlson v. Jones*, 526 F.3d 1018, 1025 (7th Cir. 2008) ("when a trial court refuses to appoint new counsel, the defendant can only show a denial of a constitutional right if he can establish that his

counsel was ultimately ineffective").  In other words, any error by the trial court in failing to grant Mr. White's pre-trial requests for new counsel is germane only to the extent that the failure to appoint new counsel resulted in Mr. White receiving ineffective assistance by his counsel in presenting his case at trial.

The Supreme Court has established a two-prong test to review claims of  ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  Mr. White must demonstrate both that his counsel's performance fell below an objective standard of reasonableness and that his counsel's deficient performance was prejudicial to him.  *Id.* at 687. Judicial scrutiny of counsel's performance is "highly deferential," and there is a strong presumption that counsel's performance falls within the range of "reasonable professional assistance."  *Id.*  In order to demonstrate prejudice, Mr. White must establish that counsel's performance rendered the proceedings "fundamentally unfair or unreliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).  If Mr. White fails to satisfy either prong of the *Strickland* test, the ineffective assistance claim fails.  *See Strickland*, 466 U.S. at 697.

The Colorado Court of Appeals, applying the *Strickland* standard, concluded that Mr. White could not show that his counsel's performance (assuming it was objectively unreasonable) was prejudicial to him.  Mr. White's Traverse identifies the "exculpatory evidence" that he contends his counsel "failed to investigate, prepare, communicate, [and] forensically test" as being "ballistic evidence which would have shown that the victim fired a weapon at him" and other evidence that is unspecified.  The Colorado Court of Appeals expressly considered whether Mr. White had shown that his counsel's alleged failure to investigate such evidence was prejudicial.  It concluded that there was no prejudice because "his co-defendant's counsel was

10

able to thoroughly cross-examine the detective on the fact that gunshot residue was found on the victims." The Colorado Court of Appeals could not find that "the outcome would have been different had [that same] evidence been highlighted again" by Mr. White's counsel, and thus found no prejudice to Mr. White from his counsel's alleged failure to investigate this evidence.[4]

As noted above, 28 U.S.C. § 2254(e)(1) requires this Court to adopt factual findings made by the state courts, unless Mr. White shows, "by clear and convincing evidence," that such a factual finding is incorrect. Mr. White has not disputed the Court of Appeals' key factual finding – that his co-defendant's counsel fully explored each of the issues his own counsel overlooked – and thus, this Court could simply adopt that finding under § 2254(e)(1). Nevertheless, the Court's own review of the record independently confirms that the Court of Appeals was correct. The prosecution called Detective Humphrey and elicited from him an acknowledgment that he did not request that the victims' hands be tested for gunshot residue. (Detective Humphrey testified that the presence of residue on the victims' hands could simply reflect the fact that the victims were in close physical proximity to a gun being fired, not necessarily that the victim had actually fired the gun. All parties' theories of the case included a gun being fired in close proximity to the victims; they simply disputed who fired the gun.) Mr. Wilkins' counsel was the first to cross-examine Detective Humphrey, and established that Detective Humphrey indeed requested residue testing on the victims. Mr. Wilkins' counsel then

---

[4]Although neither the Amended Petition or Traverse specifically describe any other items of evidence Mr. White contends his counsel allegedly failed to investigate and present, this Court can assume, from the Colorado Court of Appeals' decision on his Rule 35 motion, that Mr. White might also be referring to claims that his counsel failed to present evidence of a victims' girlfriend's motive, her hiding the victims' guns, and the fact that additional shell casings were found at the scene. These contentions form the basis of his eleventh claim for relief, discussed below.

proceeded to admit results of the residue tests on both victims, which established that both victims had gunshot residue on their hands.  Given that this issue was effectively exhausted by Mr. Wilkins' prior cross-examination of Detective Humphrey, this Court cannot say that Mr. White's counsel's failure to repeat that inquiry during Mr. White's opportunity to cross-examine Detective Humphrey is indicative of ineffective assistance.

Moreover, the record indicates that Mr. White's counsel <u>did</u> expressly address the issue of the gunshot residue in Mr. White's closing argument.  Counsel stated:

> I'm going to show you, and you will have these to take back with you, this is the gunshot residue tests and you will see that with regard to both of them, it says that there was gunshot residue found on the hands of Donzell Jenkins and the hands of Samuel Knox. . . It's on their hands. [The prosecution] do[es]n't want you to know what really happened.

Thus, the record reflects that the jury was presented with evidence that the victims had gunshot residue on their hands, and that Mr. White's counsel specifically highlighted this fact in presenting Mr. White's closing argument.  28 U.S.C. § 2254(d) authorizes the Court to grant *habeas* relief only if Mr. White can show that the state court's application of law "was contrary to or involved an unreasonable application of clearly established federal law."  This Court finds that the Colorado Court of Appeals' conclusion that Mr. White suffered no prejudice from his counsel's allegedly ineffective performance was a proper application of *Strickland* to the facts here.  Accordingly, Mr. White is not entitled to relief on claim 1.

2. <u>Inadequate jury instructions</u>

Mr. White contends that he tendered three jury instructions at the charging conference,

"including an 'apparent necessity' instruction"[5] that emphasized the jury's duty to assess his

"awareness of the need to act [in his own self-defense] because he knew in advance that the

victims were armed and dangerous."  He complains that the trial court replaced his tendered

instruction with an abbreviated version that "limited the apparent necessity to use of non-deadly

force."  Mr. White states that, by doing so, the trial court "deprived [him] of a complete

defense."

     The Court of Appeals' decision quotes the entirety of the 14-line, three-sentence

instruction tendered by Mr. White,[6] as well as the significantly-abbreviated instruction ultimately

given by the trial court: "A person may act in self-defense on the basis of apparent necessity, or a

reasonable but erroneous belief that the use of unlawful physical force is imminent."  The Court

of Appeals understood Mr. White's contention on appeal to be that the instruction given by the

trial court "restricted the jury's consideration of this doctrine to the use of nondeadly physical

---

[5]Self-defense is viable only where an imminent danger of harm to the defendant warranted the conduct that now gives rise to the criminal charges. In some circumstances, a defendant may misperceive the nature or existence of the threat against him, using force in response to a threat that is not actually as severe as the defendant subjectively believed.  In these circumstances, courts sometimes give an "apparent necessity" instruction that advises the jury that a defendant's <u>mistaken</u> belief of imminent harm can nevertheless support a claim of self-defense, so long as that mistaken belief was reasonable in light of the circumstances as they appeared to the defendant at the time.

[6]Mr. White's tendered instruction read "When a person has [ ] reasonable grounds for believing, and does in fact actually believe, that danger of his being killed or receiving great bodily injury is imminent, he may act on such appearance and defend himself.  A person may act on such appearances even to the extent of taking a human life when necessary, although it may turn out that the appearances were false or although he may have been mistaken as to the extent of the actual danger.  Apparent necessity, if well grounded, and of such a character as to appeal to a reasonable person under similar conditions or circumstances, as being sufficient to require action, justifies application of self-defense to the same extent as actual or real danger."

force."[7]

The Court of Appeals concluded that it was error for the trial court to give the "apparent necessity" instruction, but found that the error was rendered harmless by the fact that the trial court also gave instructions "on the use of deadly physical force in self-defense." Colorado's statutory self-defense provision, C.R.S. § 18-1-704, includes a provision focusing on "what [the defendant] reasonably believed" to be an imminent threat. The Court of Appeals explained that "a separate instruction defining a defendant's right to act upon 'apparent necessity' is not required when the jury is instructed . . . that a defendant is entitled to act in self-defense upon the defendant's reasonable belief," as "our supreme court abrogated the need for a separate [apparent necessity] instruction" in such circumstances. *Citing Beckett v. People*, 800 P.2d 74 (Colo. 1990). The Court of Appeals found that "the self-defense instructions given here, framed in the statutory self-defense language, adequately apprised the jury to consider [Mr. White's] reasonable belief to act in self-defense." Thus, the Court of Appeals "reject[ed Mr. White's] contention that the apparent necessity instruction restricted the doctrine to non-deadly self-defense."

---

[7]Mr. White's appellate brief to the Colorado Court of Appeals framed this contention with greater clarity. He argued that the trial court gave two separate self-defense instructions, one explaining that a defendant can use <u>non-deadly</u> force in self-defense against impending "unlawful physical force" from the victim, and one which explained that a defendant can use <u>deadly</u> force in self-defense in response to an "imminent danger of being killed or of receiving great bodily injury." The "apparent necessity instruction" given by the trial court made mention of a defendant's belief that "unlawful physical force" was imminent. Mr. White contends that the use of the phrase "unlawful physical force" linked the "apparent necessity" instruction to the instruction concerning the use of non-deadly physical force in self-defense, which incorporates the same phrase, but deprived him of the benefits of an "apparent necessity" instruction with regard to his use of deadly self-defense, which uses a different phrase to describe the harm sought to be avoided by the defendant.

Jury instructions describe principles of state law, and to the extent they do so incorrectly, the error is one for the state courts to correct, if they see fit. *See Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005).   On federal *habeas* review under § 2254, this Court's role in evaluating a claim premised upon erroneous jury instructions is limited to ascertaining whether the instructional errors "had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in a constitutional sense." *Robinson v. Ward*, 232 Fed.Appx. 785, 789 (10th Cir. 2007) (unpublished), *citing Shafer v. Stratton,* 906 F.2d 506, 508 (10th Cir. 1990).   The question is not whether the challenged instructions were "undesirable, erroneous, or even universally condemned, but whether the instruction so infected the trial that the resulting conviction violates due process." *Id., citing Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997).

The instructions described by the Colorado Court of Appeals do not rise to the exacting level of "violat[ing] due process"; indeed, the Court has some doubt that they inhibited Mr. White's invocation of self-defense in these circumstances at all.   Key to this conclusion is *Beckett*'s holding that an "apparent necessity" instruction – the instruction Mr. White complains was incomplete – is superfluous when the jury is properly instructed on the statutory self-defense elements.   As *Beckett* explains, the statutory definition of self-defense "reflects what has long been the settled law of this jurisdiction, namely, [apparent necessity] rather than absolute certainty is the touchstone of self-defense."   800 P.2d at 78.   The statutory language requires the jury to consider whether the defendant "reasonably believe[d]" – rightly or wrongly – that physical harm was imminent, thus wholly incorporating the "apparent necessity" doctrine. C.R.S. § 18-1-704(1).   By giving correct statutory self-defense instructions regarding both

15

deadly and non-deadly force, the trial court thus gave the jury instructions consistent with Mr.

White's claim that he "reasonably believed of an apparent necessity to use deadly force under

the circumstances as he perceived them."  At best, Mr. White has shown only that the trial court

gave an duplicative standalone "apparent necessity" instruction that simply repeated one aspect

of the defense as it related to the use of non-deadly force in self-defense.  But because the

deadly-force instruction was complete on its face, incorporating the "apparent necessity"

doctrine within it, the erroneous standalone instruction did not mislead the jury with regard to

the apparent necessity to Mr. White of the need to use deadly force in self-defense.  Accordingly,

Mr. White's second claim is without merit.

### 3.  "Picked-on" juror

Mr. White's Amended Petition alleges that, on the second day of deliberations, a juror

requested to speak to the judge, explaining that "the jurors were having a big problem, that he

was alone in his viewpoint on one issue and felt he was being picked on," and sought

clarification from the court on an issue.  According to Mr. White, the trial judge refused to

clarify anything and ordered the juror to resume deliberations.  Later, the trial judge allegedly

stated, on the record, that the juror "was quite a guy" and "was now labeled a snitch because he

had spoken with the court."  Mr. White contends that the trial court's actions violated his Sixth

Amendment right to a trial by jury.

### A.  Facts

This Court begins with the facts as explained by the Colorado Court of Appeals'

decision.  According to the Court of Appeals, after the juror submitted a request to speak with

the judge, "all counsel agreed to the judge's *ex parte* communication with the juror on the record

16

in chambers." A quoted excerpt of the trial record indicates the following colloquy:

> JUROR: We're having a big problem in there and I feel – I don't know if I can continue.  It's –
>
> THE COURT: All right.
>
> JUROR: Can I say what?
>
> THE COURT: What's going on?
>
> JUROR: I'm alone in this one position and everybody is just picking on me and it's – I don't know if I'm right or wrong.  It's like – can you clarify something for me?
>
> THE COURT: I really can't without the other jurors.  But what you need to do is go back in there and continue to deliberate.  If there's a problem or if the jury has a question again, communicate that in writing.

After this colloquy, the court reconvened with the parties, at which time Mr. White's counsel requested that the court give the jury an *Allen* charge, a request the court denied.  The jury returned a verdict approximately two hours later, without further communication with the court.

The Court of appeals found that "the juror did not raise, nor did the *ex parte* communication establish, that the juror had a fundamental misunderstanding of a point of law," that the trial judge did not "clarify anything substantive without the approval of counsel or outside the presence of other jurors," and thus, that "the court's initial response requiring that the juror communicate questions in writing could not have prejudiced [Mr. White]" and did not constitute an abuse of discretion by the trial court.  The Court of Appeals also found that "the juror's *ex parte* communication did not sufficiently demonstrate that the jury was deadlocked" and that his "sentiment that he felt alone in his position is not analogous to a jury communication that it is at an impasse on a particular offense."  Thus, the Court of Appeals found that the refusal

of the trial court to give an *Allen* instruction was not error.  Neither Mr. White's Amended Petition nor his Traverse contend that the Court of Appeals' factual findings on this issue are incorrect, and this Court's own review of the record finds that the preceding discussion is accurate.

Mr. White does make a reference that the Court of Appeals did not address, contending that the trial court "not[ed] that this particular juror must now be labeled a 'snitch.'" With regard to this point, the record indicates that, after speaking to the juror, the trial court convened to discuss the issue with counsel.  The court proposed giving a modified *Allen* instruction to the jurors.  The prosecutor the stated a concern: "I don't want the jury to think that this juror came and spoke with you, came looking for help or turning to someone or tattling perhaps. . . ."  The prosecutor proposed a modification in the *Allen* instruction "changing it to [']the Court reminds the jury that they are to work together[']."  "That way," the prosecutor explained, "it is not between you and [the juror]."  The court responded "I got a feeling he has got a jacket in that room," to which the prosecutor responded, "If it would be better not really based on what he said."  The court then polled counsel on whether an *Allen* instruction should be given, and although Mr. Wilkins and Mr. White's counsel agreed that such an instruction should be given, the prosecution objected and the court declined to give any instruction.

## B.  Analysis

In Mr. White's Traverse, he makes clear that the basis for his Sixth Amendment challenge with regard to this set of facts is that "this failure to instruct with a modified *Allen* instruction . . . was an abuse of discretion."  He contends that, when confronted with a juror who claimed to be "alone" on one issue, the trial court's refusal to give an *Allen* instruction to the

entire jury was the equivalent of the court giving an *Allen* instruction to the single juror. In other words, by failing to instruct all jurors to take into consideration the opposing views of their fellow jurors, the trial court implicitly (and improperly) conveyed to the lone juror that he should surrender his objections and join the majority.

Mr. White equates this situation to the one in *U.S. v. Zabriske*, 415 F.3d 1139, 1147-48 (10th Cir. 2005). In *Zabriske*, the 10th Circuit reversed a criminal conviction where the trial court received numerous notes from the jury indicating that a lone holdout was refusing to deliberate, and the court resolved that issue by essentially giving a private *Allen* charge to only the holdout juror, not the entire jury. The 10th Circuit held that an *Allen* charge, which inherently possesses some risk of coercing dissenting jurors, becomes coercive as a matter of law when delivered only to a holdout juror. *Id.* Mr. White argues that "basically, this is the situation we have in [this case]." He contends that "by returning the juror to deliberations in which he already felt picked upon, the court in essence coerced the juror into reaching a verdict [because] the court could not clarify a question for him and/or failed to tell him that he needed to maintain his beliefs in the evidence."

Mr. White's reliance on *Zabriske* is misplaced. The facts of the two cases are fundamentally different. Unlike in *Zabriske*[8], the trial court's communication with the lone juror here contained none of the coercive characteristics of an *Allen* charge. In this case, the only information communicated by the trial judge to the holdout juror was that: (i) the judge

---

[8] See 415 F.3d at 1147 n. 11 (noting that the court's communication with the holdout juror included all "essential elements of a typical *Allen* charge: a juror is told . . . that absolute certainty cannot be expected . . ., that they have a duty to reach a unanimous verdict if they can conscientiously do so, and that dissenting jury members should accord some weight to the fact that a majority of jurors hold an opposing viewpoint").

could not "clarify" anything for the juror outside the presence of the other jurors; and (ii) if there continued to be a problem, the jury could communicate a question to the court in writing.  Not only were these instructions correct, both were highly prudent. *See U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 461 (1978) ("any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants") *and U.S. v. Powell*, 226 F.3d 1181, 1193 (10th Cir. 2000) (when faced with a vague or ambiguous request by a jury for clarification, trial judge may properly advise the jury to review existing instructions and, if their confusion persists, to "pose another, clearer question").

Mr. White offers no particular argument as to how these instructions operated to "coerce" the holdout juror into surrendering his beliefs.  Mr. White appears to assume that the juror felt coerced to agree with other jurors because the trial court refused to separately clarify instructions or give additional instructions to the juror.

This Court finds no support for such assumption.  First, one purpose of not separately instructing a single juror is to avoid coercion of the juror.  Separate instruction of individual jurors not only defeats the equality implicit among jurors, it has the potential to be perceived as a directive from the judge on the issue of disagreement among the jurors. By telling the juror that if the jury still had a "problem" when it reconvened, they could collectively submit a written communication seeking clarification, the trial court ensured that all jurors had the opportunity to obtain clarification of the point in dispute.  Second, to the extent that Mr. White contends that juror felt coerced because the judge did not reaffirm his perspective, the record is devoid of any such indication. The fact that the jury ultimately reached a unanimous verdict is not sufficient to

infer coercion of the "picked-upon" juror.  It is equally possible that upon two additional hours of reflection and consideration of the evidence, the members of the jury reached an informed and voluntary consensus.

The Court ascribes no particular significance to the Court's remark about the juror having "a jacket in that room."  Even assuming, as Mr. White does, that the reference to a "jacket" is the equivalent of "snitch," the record reflects only that the court agreed with the prosecutor that it would be preferable for the remainder of the jurors not to know that the lone juror had sought to speak privately with the court, and indeed, the court did not take any action that alerted the remaining jurors to that fact.  The record does not suggest that the "jacket" comment reflected any bias by the court or that the court sought to unduly influence the jurors' deliberations; if anything, it reflects the court's sensitivity to the pressure felt by what appeared to be lone holdout juror and the need to avoid taking action that would exacerbate that pressure.  Thus, the "jacket" comment does not advance Mr. White's argument.

For these reasons, as well as the reasons stated by the Colorado Court of Appeals, which this Court finds the Court of Appeals' decision to be a reasonable application of federal law to the facts presented here, and the Court finds that this claim is without merit.

4.  <u>Admission of prior conviction</u>

Mr. White contends that the trial court deprived him of due process by admitting into evidence the fact that Mr. White had previously been convicted in 2000 of illegal discharge of a firearm ("the 2000 conviction" or "the illegal discharge conviction").  Mr. White contends that the 2000 conviction had been obtained unlawfully, in that his counsel in that case did not provide effective assistance in various respects.  Claims of ineffective assistance of counsel in prior

proceedings assert a "unique constitutional defect" that "rise[s] to the level of a jurisdictional

defect." *Daniels v. U.S.*, 532 U.S. 374, 378 (2001). As a result, where a defendant was

previously convicted of criminal conduct A, and that conviction is sought to be used against the

defendant in a later trial on criminal conduct B, the defendant may collaterally attack the prior

conviction on conduct A during case B if (and only if) the defendant contends that his counsel in

case A provided ineffective assistance in case A. *Id.* at 382; *U.S. v. Cousins* 455 F.3d 1116,

1125 (10th Cir. 2006).


A. Facts

The Court first examines the Colorado Court of Appeals' findings with regard to this

issue. The Court of Appeals found that, prior to trial in the instant case, Mr. White moved to

exclude evidence of his 2000 conviction for illegal discharge of a firearm on the grounds that

that conviction had been obtained in violation of his constitutional right to effective assistance of

counsel. According to the Court of Appeals, Mr. White's complaints about his representation in

the 2000 illegal discharge case fell into two categories: (i) failure of his counsel to adequately

prepare for trial, and (ii) failure of his counsel to investigate possible defenses, including self-

defense and "an alternative suspect defense." The trial court held a hearing on the motion, at

which Mr. White submitted the transcripts of the 2000 trial on the illegal discharge case, but did

not present any testimony from Mr. White's counsel in that case or present "any witness to

testify as to what a reasonably competent attorney ought to have done" in that case.

The Court of Appeals found that Mr. White's evidence "failed to make the requisite

*prima facie* showing of ineffective assistance of counsel." It found that the trial court properly

analyzed the claim of ineffective assistance under *Strickland* and that the trial court properly concluded that Mr. White had shown neither that his prior counsel's performance was outside the range of competent assistance or that he was prejudiced as a result. "[Mr. White's] minimal offer of proof," the court explained, supports the trial court's conclusion that his [2000] prior felony conviction was not obtained in violation of his right to counsel."

Mr. White's Traverse describes the events somewhat differently. He states that "the trial court made [its] finding even though it did not conduct an evidentiary hearing in which the [prior] conviction trial counsel testified. In other words, the trial court just presumed that trial counsel in the [prior] case was effective." Mr. White ambivalently explains that his dispute with the Court of Appeals' finding, stating that "the problem with [the Court of Appeals'] finding is that [the trial court] either didn't allow counsel to call the prior trial attorneys as witnesses . . . or alternatively, this is further proof of Mr. White's claims [in claim 1, *supra*] of denial of the assistance of counsel altogether, as [Mr. White] told [his current counsel] to contact/call the prior attorneys whom would have testified that he conducted no investigations and lacked sufficient time to prepare for trial."

This Court's own review of the trial record reveals that on April 21, 2003, Mr. White filed a Motion to Suppress Prior Conviction. That 12-page filing explained that in 2000, Mr. White proceeded to trial on two counts of attempted first degree murder (one on each of two alternative legal theories) and one count of illegal discharge of a firearm, arising from an occurrence in which Mr. White allegedly fired a shot into a car being driven by a female friend with whom he had had an argument. It is not completely clear from the present record what trial strategy Mr. White's counsel employed in the 2000 case, but it appears that counsel elected to

concede that Mr. White fired at the car.  The strategy was sufficiently successful in that Mr.

White was acquitted of the attempted murder charges and was convicted only of the illegal

discharge count.  In this case, Mr. White's counsel contended that counsel in the 2000 case was

ineffective for several reasons: (i) counsel did not present a self-defense claim by Mr. White, tha

he fired in response to the friend driving the car towards him; (ii) counsel failed to investigate

and cross-examine a third person at the scene, one called as a witness by the prosecution, who

was prohibited from being in the presence of the female friend due having previously menaced

the female friend, thus giving rise to what Mr. White's present counsel describes as a

"alternative suspect" with regard to the shooting; (iii) counsel failed to investigate and cross-

examine the female friend, who herself had been known to carry a gun and had previously been

convicted of false reporting; and (iv) failed to present various other facts that would arguably

have led to Mr. White's exoneration. On May 8, 2003, the trial court conducted a hearing on that

motion.  At that hearing, Mr. White's counsel stated "We don't have any testimony to present to

the Court this afternoon, but I do have a little bit of further information to provide to the Court."

Mr. White's counsel then proceeded to elaborate on the arguments raised in the written motion,

as well as to tender certain additional documents (including transcripts from the 2000 trial)

supporting those arguments.  The prosecution disagreed that Mr. White's 2000 counsel had been

ineffective and argued instead that, in light of the female friend's positive identification of Mr.

White as the person firing the gun, success in avoiding conviction on the attempted murder

charges demonstrated that Mr. White's counsel's strategy was extremely effective.  After

reviewing the materials tendered by Mr. White's counsel, the trial court denied the motion.

After reciting the *Strickland* standard, the trial court explained that Mr. White's counsel's

conduct in the 2000 action "were within the wide range of professionally competent assistance" and indeed, "resulted in a rather favorable outcome for Mr. White."

B. Analysis

On the record presented, this Court cannot say that the state court's application of *Strickland* to the facts before it was incorrect. The record indicates that Mr. White sought to demonstrate his prior counsel's ineffectiveness in the 2000 case solely by tendering trial transcripts from that proceeding (and certain collateral material gleaned from public records). This evidence is insufficient to carry Mr. White's burden of proving that his representation in the 2000 case was ineffective. Although those transcripts reveal the trial strategy counsel pursued (and those it did not pursue), they do not reveal whether Mr. White's counsel adequately investigated the facts underlying potential alternative strategies, nor do they reveal facts that overwhelmingly demonstrate that an alternative strategy would have produced a full acquittal of Mr. White. At best, Mr. White has shown only that his 2000 counsel selected one trial strategy from among several that may have been available. Such strategic decisions, when made after thorough investigation of law and facts, are "virtually unchallengeable." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). Although Mr. White attempted to argue to the trial court in this case that his 2000 counsel did not undertake such a "thorough investigation," nothing in the state court record indicates that Mr. White tendered any evidence in support of this contention. Indeed, it appears that Mr. White's argument to this effect was entirely based on the *post hoc ergo propter hoc* fallacy – that the reason why Mr. White's 2000 counsel did not put forward one or more of these alternative trial strategies instead must be because counsel did not adequately investigate them. The trial court properly rejected this argument.

Under these circumstances, this Court cannot say that Mr. White has shown that the state court's findings – that Mr. White failed at trial in this case to demonstrate that his 2000 conviction was obtained as a result of his then-counsel's ineffectiveness – are an incorrect application of *Strickland* to the factual record here.  Thus, Mr. White is not entitled to relief on this claim..[9]

    5.  <u>Severance</u>

Mr. White's fifth claim alleges that his 6th and 14th Amendment rights were violated when the trial court refused to sever trial of his co-defendant, Mr. Wilkins, from Mr. White's trial.  Mr. White contends that Mr. Wilkins presented an antagonistic defense to Mr. White, insofar as Mr. White intended to argue that he acted in self-defense, but Mr. Wilkins "alleged that he had just joined Mr. White and gone to the victim's house to commit a drug deal," and further, that Mr. Wilkins had "stated he intended to testify against Mr. White and allowed certain evidence, such as the gun [Mr. Wilkins] possessed to be allowed into evidence," thus undercutting Mr. White's claim of self-defense.

The Colorado Court of Appeals addressed the two aspects of Mr. White's claim separately.  Turning first to Mr. White's claim that severance was required because Mr. Wilkins intended to present a defense antagonistic to Mr. White's, the Court of Appeals observed that while Mr. White's theory was simply one of self-defense, Mr. Wilkins presented a hybrid defense, invoking self-defense in response to the charge of menacing, but invoking a mistake of

---

[9]The natural extension of Mr. White's argument on this claim is that his current trial counsel rendered ineffective assistance to him in the instant case by failing to adequately present and support an argument for excluding evidence of the 2000 conviction.  This contention is asserted as Mr. White's eleventh claim for relief, which is addressed *infra*.

fact defense with regard to the murder charges.  In short, Mr. Wilkins "asserted that he lacked the knowledge that [Mr. White] intended to do anything other than a drug transaction."  The Court of Appeals found that these defenses are "neither antagonistic nor mutually exclusive." Noting that the test for antagonistic defenses is whether "the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other," the Court of Appeals found that "the jury plausibly could have both believed that [Mr. White] acted in self-defense when the drug transaction went awry and at the same time believed that [Mr. Wilkins] had no knowledge that [Mr. White] intended to commit murder."

In elaborating on this claim in his Traverse, Mr. White's argument is somewhat difficult to follow.  He first recounts some pretrial jockeying over a statement Mr. Wilkins had given to police, exculpating himself and accusing Mr. White of being the shooter, but Mr. White eventually acknowledges that the State agreed not to present that statement at trial, and there is no indication that the jury ever heard it.

Next, Mr. White points out that Mr. Wilkins "tendered his theory of the case instruction" that asserted that Mr. Wilkins "lacked any intent to assist Mr. White in murdering the victim, *i.e.* Mr. White acted alone and had killed the victim on his own."  Mr. White contends that this is "tantamount to testifying against Mr. White via a jury instruction."  The instruction actually given by the trial court stated "It is [Mr. Wilkins'] theory of the case that he entered [the home] for the purpose of a drug deal without knowledge that [Mr. White] intended to do anything but a drug deal, thus lacked the intend to aid, assist, promote or facilitate [Mr. White] in any way to kill anyone and acted in self-defense."

Finally, Mr. White complains that Mr. Wilkins "introduced the weapon found in his

possession," which "forced Mr. White to adopt a position that he was the shooter . . . because he could not blame [Mr. Wilkins] for the shooting."  (The Court discusses Mr. Wilkins' involvement with a particular weapon in more detail *infra.*  To understand this portion of Mr. White's argument, it is sufficient to note simply that Mr. Wilkins eventually led police to the location of an unfired weapon.)  Mr. White explains that "the trial court allowed the unfired, identical weapon to be inferred to have belonged to [Mr. Wilkins] even though there was no proof that it did."   Mr. White contends that Mr. Wilkins' defense "directly undermine[d] Mr. White's claims of self-defense, but [also] prevented him from pointing the finger elsewhere, thus denying him a choice of defenses."

Although questions of improper joinder are typically matters of state law and do not implicate the U.S. Constitution, misjoinder can amount to a federal constitutional violation if "it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *U.S. v. Lane*, 474 U.S. 438, 446 (1986); *Lathrop v. Dinwiddie*, 317 Fed.Appx. 842, 845 (10th Cir. 2009) (unpublished) ("whether the trial court erred in denying severance is generally a question of state law that is not cognizable on federal *habeas* appeal," but "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial").  To obtain *habeas* relief for failure to sever in the face of antagonistic defenses, Mr. White must show the defenses urged by the parties

> were so antagonistic that they are mutually exclusive.  Severance is not warranted, however, merely because defense theories conflict or because one defendant is attempting to cast blame on the other.  Mutually antagonistic defenses are not prejudicial *per se*.  The defenses truly must be mutually exclusive, such that the jury could not believe the core of one defense without discounting entirely the core of the other.

*Campbell v. Ward*, 315 Fed.Appx. 82, 85 (10th Cir. 2009) (unpublished).

The Colorado Court of Appeals correctly applied this law to Mr. White's claim.  In doing so, the Court of Appeals also correctly concluded that Mr. Wilkins' defense strategy (that he did not share any premeditated intent that Mr. White may have had)  is not mutually exclusive with Mr. White's defense strategy (that he harbored no premeditated intent and shot the victims only in self-defense).  It is entirely possible for the jury to believe both defenses at the same time; for example, the jury could have accepted both men's contention that they went to the house with no premeditated intent towards the victims, and that Mr. White began shooting only in self-defense. Mr. White's remaining arguments on this point – *e.g.* that Mr. Wilkins' joinder prevented Mr. White from fingering Mr. Wilkins as the shooter – do not give rise to an entitlement to severance.  *Id.* ("severance is not warranted . . .because one defendant is attempting to cast blame on the other").   Thus, the Court of Appeals correctly applied federal law to the facts of this case, and Mr. White is not entitled to relief on the grounds of improper joinder due to antagonistic defenses.

The second component of Mr. White's claim for severance comes from the fact that Mr. Wilkins "had led police to the weapon used."  As the Colorado Court of Appeals explains, the State's firearms expert testified that "all 13 shell casings [recovered from the scene of the crime] had been fired from the same weapon, which was characteristic of a .40 caliber Glock firearm." At the same time, there was testimony that Mr. Wilkins had led police to an alley where a .40 caliber Beretta weapon was found, although the State's firearms expert testified that the shell casings found at the scene of the crime had <u>not</u> been fired by the Beretta produced by Mr. Wilkins.  Mr. White complained to the Court of Appeals that introduction of evidence relating to

the unfired Beretta "prejudiced him because (1) it impermissibly resulted in the implication that this weapon belonged to [Mr. Wilkins]; and (2) it prevented [Mr. White] from implicating [Mr. Wilkins] for firing any of the shots."  The Court of Appeals concluded that these arguments did not warrant severance, in that "the record in no way supports the proposition that [Mr. Wilkins] may have been responsible for some of the shots fired," both as a result of the State's firearm expert's testimony that all shots were fired from the same gun, and from "eyewitness testimony [that] established that [Mr. Wilkins] never fired his weapon."  Analyzing this aspect of the severance claim under the rule that "a defendant is entitled to severance as a matter of right [under state law] if there is material evidence admissible against one, but not all, of the parties and admission of the evidence is prejudicial to the party against whom the evidence is not admissible," the Court of Appeals concluded that Mr. White had not shown that the evidence of the Beretta, even if improperly introduced as against him, resulted in any prejudice.

Mr. White's Traverse contends that introduction of the Beretta was prejudicial to him because the weapon was "identical to the weapon used to kill the victim" and that "[Mr. Wilkins] could not prove that [the Beretta] was [Mr. Wilkins'] or that the weapon actually used to kill the victim wasn't his."  Mr. White believes that introduction of the Beretta "forced Mr. White to adopt a position that he was the shooter" because allowing evidence that Mr. Wilkins led the police to the (unfired) Beretta allowed the jury to "infer[ that it] belonged to [Mr. Wilkins] even though there was no proof that it did."

Once again, the Court assumes that "in egregious cases," joinder of co-defendants that allows certain evidence to be admitted as against one co-defendant, where such evidence would be inadmissible in a separate trial against the other co-defendant, a deprivation of constitutional

due process can arise.  *Lopez v. DelPapa*, 290 Fed.Appx. 41, 44 (9th Cir. 2008) (unpublished),

*citing Lane*, 474 U.S. at 461 n. 3 (Brennan, J. concurring in part).  Here, the crux of Mr. White's

complaint is that Mr. Wilkins' cooperation with police effectively identified Mr. White as the

shooter.[10]  As the Court of Appeals found – in factual findings which are treated as

presumptively true and are unrebutted by Mr. White here – the evidence at trial established that

all 13 shots were fired from one weapon and that eyewitnesses indicated that Mr. Wilkins was

not firing his weapon.  This testimony would have been equally admissible against Mr. White in

a separate trial, and would have established him as the shooter regardless of whether evidence of

Mr. Wilkins' cooperation with the police was admitted.  Because any admission regarding Mr.

Wilkins' knowledge of the location of the unfired Beretta was merely cumulative of properly-

admitted evidence identifying Mr. White as the shooter, admission of Mr. Wilkins' evidence did

not prejudice Mr. White's defense.  *Lane*, 474 U.S. at 446 (misjoinder does not constitute

constitutional error without a showing of actual prejudice).  Thus, Mr. White is not entitled to

relief on this claim.

### 6.  Juror challenges for cause

Mr. White contends that, during jury selection, "four separate jurors contended that drug

dealers . . . forfeit their right to act in self-defense if things go wrong during their transaction."

Mr. White challenged these jurors for cause, but the trial court refused to excuse them on those

grounds.  As a result, Mr. White was "forc[ed] . . . to use all his peremptory challenges and still

be stuck with biased jurors."

---

[10]Implicit in this argument is that Mr. White contends that, had the trials been severed, he
could have credibly alleged that Mr. Wilkins was the only shooter.

The Colorado Court of Appeals assessed the record regarding each of the four jurors individually.  This Court will not repeat that analysis, and instead will merely observe that each juror made comments that indicated some resistance to the notion of self-defense being invoked by those engaged in illegal activities.  Nevertheless, upon further questioning, each juror also indicated a willingness to follow the law as instructed.   Observing that a defendant's right to a fair trial is violated where a juror is "unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions," the Court of Appeals ultimately concluded that "none of the four challenged jurors' responses indicated any bias, prejudice, or similar grounds for disqualification," and thus, "the trial court [did not] abuse[ ] its discretion in denying [Mr. White's] challenges for cause."

In his Traverse, Mr. White does not dispute that the Court of Appeals correctly summarized each prospective juror's responses; indeed, Mr. White specifically points the Court to the Court of Appeals' decision "for a detailed explanation of what each juror stated."  Mr. White also acknowledges that "the use of the peremptory challenges to remove these 4 jurors does not violate Mr. White's constitutional right to a fair trial."  Instead, he contends, "it did . . . deny him his statutory right to remove each juror for cause," citing C.R.S. § 16-10-103(1)(j).  He contends that this statutory violation "did in fact violate [his] right to a fair trial before an impartial jury."

To satisfy constitutional standards, the trial court must empanel jurors who are "impartial"; to be "impartial," a juror must be able to "lay aside his opinion and render a verdict based on the evidence presented in court."  *Patton v. Yount*, 467 U.S. 1025, 1036 n. 12 (1984).

Whether a particular juror's answers to *voir dire* questions indicate that the juror is excusable for cause – *i.e.* because the juror cannot lay aside his own opinions – is a question of fact to be resolved by the trial court, such resolution to be granted "special deference" by *habeas* courts. *Id.* Thus, 28 U.S.C. § 2254(d)'s presumption of correctness of state court factual findings applies to state court findings regarding a juror's impartiality. *Id.* at 1038. Here, the Court of Appeals concluded that "none of the four challenged jurors' responses indicated any bias, prejudice, or similar grounds for disqualification," and this Court is required to defer to those findings unless Mr. White can show otherwise. Mr. White has not done so, and thus, the Court concludes that the state court's application of federal law to this claim was not unreasonable.

Even assuming that the trial court somehow erred in not excusing one or more of the jurors for cause upon Mr. White's request, Mr. White is nevertheless not entitled to *habeas* relief because he was able to remove each of the jurors through the use of peremptory challenges. In *U.S. v. Martinez-Salazar,* 528 U.S. 304, 315-16 (2000), the Supreme Court held that "if the defendant elects to cure such an error [*i.e.* the trial court in not excusing a biased juror for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."[11] Although Mr. White's Amended Petition contains a bare assertion that he was forced to "use all his peremptory challenges and still be stuck with biased jurors," his Traverse, which sets forth his contentions in far greater detail, indicates that he made "use of the peremptory challenges to

---

[11] *Ross v. Oklahoma*, 487 U.S. 81 (1988), upon which *Martinez-Salazar* is based, aptly disposes of the argument in Mr. White's Traverse – that the erroneous refusal to dismiss the challenged jurors for cause deprived him of a state-created right to a certain number of peremptory challenges, thereby warranting relief. The Court in *Ross* addressed and rejected precisely this argument.

remove these 4 jurors." The Traverse makes no mention of "biased jurors" remaining on the jury or otherwise makes any contention that the jury ultimately empaneled was somehow improper. Under these circumstances, this Court cannot find that, even if the trial court erred in not removing one or more of the challenged jurors for cause, that error was harmless and does not give rise to *habeas* relief. *Watley v. Williams*, 218 F.3d 1156, 1160 (10th Cir. 2000).

       7.  <u>Admission of photographs</u>

Mr. White contends that the admission of "extremely prejudicial photographs" of the victims amounted to a deprivation of his 6th and 14th Amendment rights. He contends that the photos did not accurately represent the crime scene, as "the victim's bodies were moved prior to the police arriving on the scene."

The Colorado Court of Appeals refused to reach the merits of this contention. It stated that "[Mr. White] . . . asserts the photographs were irrelevant because the bodies had been moved prior to being photographed and thus did not accurately portray the crime scene." It then found that Mr. White "did not raise [this] argument during trial; therefore we will not consider it for the first time on appeal."

Mr. White acknowledges that this objection to the photographs' admission was not raised at trial. In his Traverse, he explains that "evidence of movement of the bodies did not come about until trial and thus . . . couldn't have been raised at [a pre-trial] suppression hearing," where the trial court apparently made its ruling allowing the photos to be admitted. Mr. White requests that the Court "independently reach the merits of this claim and grant *habeas* relief as was the case in *Spears v. Mullin*, 343 F.3d 1215, 1225 (10th Cir. 2003). *Spears* indicates that a *habeas* court can reach an issue that was not addressed on its merits by the state court if the

claim "is not otherwise procedurally barred."

Mr. White's invocation of *Spears* is misplaced.  This is not a situation in which the state courts simply failed to address an issue that he raised; the Court of Appeals refused to reach the merits of Mr. White's argument that the photographs were improperly admitted because Mr. White did not lodge a contemporaneous objection to the photographs on that ground during trial. *Habeas* review of state court rulings is precluded where the ruling rests on a state-law ground that is independent of the federal question and adequate to support the judgment.  *Smith v. Addison*, 373 Fed.Appx. 886, 888 (10th Cir. 2010) (unpublished), *citing Beard v. Kindler*, 130 S.Ct. 612, 614 (2009).  A state-law ground is "independent" if it relies on state law rather than federal law, and "adequate" if it is firmly-established and regularly-followed.  *Id.*  A state court's refusal to reach a claim because a party did not lodge a contemporaneous objection to the ruling at trial is one that can be deemed to rest on an independent and adequate state-law ground.  *See e.g. Glacken v. Dickhaut*, 585 F.3d 547, 550-51 (1st Cir. 2009).

Here, the requirement of a party to lodge a timely objection to an evidentiary ruling is firmly-established in Colorado.  *Wilson v. People*, 743 P.2d 415, 419 (Colo. 1987), *citing* C.R.Crim.P. 52(b); *People v. Salazar*, 964 P.2d 502, 507 (Colo. 1998) ("It is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal").  It is a rule that derives entirely from state law, with no apparent federal nexus, and by all appearances, is consistently applied by the Colorado courts.  *Id.*  Thus, in rejecting Mr. White's argument for lack of contemporaneous objection, the Colorado Court of Appeals resolved the issue on an independent and adequate state ground.

Under these circumstances, Mr. White must show "cause and prejudice" for his failure to

preserve the objection to the photographs' admission, or show that this Court's failure to reach the claim would amount to a fundamental "miscarriage of justice." *Smith*, 373 Fed.Appx. at 888-89. Mr. White does not offer any argument on these points, and thus has not carried his burden. In any event, this Court cannot find that the admission of the photographs was particularly prejudicial to Mr. White. Nothing prevented Mr. White from exploring the crux of his objection – that the bodies shown in the photographs had been moved from their original locations before the photos were taken – through cross-examination or presentation of other evidence to that effect. At that point, it would be up to the jury to determine whether the photographs did or did not accurately depict the locations of the bodies. Indeed, it appears from the record that Mr. White's counsel made just such an argument in closing:

> The integrity of the crime scene. You heard from Dr. Wahe how important it is, not even the police officers can touch those bodies, but Tonya Smith altered that crime scene and Kim Campbell altered that crime scene. She said she picked Samuel Knox up from the bed. They are saying that Samuel Knox was lying on the floor when he's shot. Impossible. . . . What else was touched? What else was moved? . . . But think about it. These women changed this crime scene.

Accordingly, the Court finds that the state court's decision on this issue was based on an adequate and independent state ground and Mr. White is not entitled to relief on this claim.

### 8. Prosecution's closing argument

Mr. White contends that the prosecution argued in closing that "it was the jurors' 'job' and 'responsibility' to hold Mr. White 'accountable' for the victims' death." Mr. White contends that this language "encouraged the jury to retaliate against [him] and conveyed [the prosecutor's] personal belief that Mr. White had committed the offense with which he was charged."

The Colorado Court of Appeals found that "the prosecutor began and ended by informing the jury that it had the power and responsibility of 'holding somebody accountable for their actions' and this function, after weighing the evidence presented, was its 'job.'" On its rebuttal argument, the State returned to that theme, "requesting that the jury 'hold defendants accountable for all of their actions . . . and for first degree murder." The Court of Appeals evaluated these statements "in the context of the prosecutor's entire argument," and concluded that "the limited commentary requesting the jury to hold [Mr. White] accountable was not improper." It noted that "the commentary was a small part of the closing argument in which the prosecutor fairly summarized the evidence," and furthermore, that "there was overwhelming evidence of guilt presented at trial, including eyewitness testimony that [Mr White] shot and killed the victims."

In his Traverse, Mr. White does not dispute any particular finding by the Court of Appeals, but contends that it is impermissible for a prosecutor to "appeal[] to jurors to act as the conscience of the community or [to] make remarks intended to inflame the jurors' passions, leading them to convict for some reason other than the facts of the case." Mr. White concedes that, in focusing on the prejudicial effect of the State's remarks, the Court of Appeals "correctly identified the controlling legal principle," but contends that it incorrectly applied that principle, largely on the strength of his ninth claim for relief, based on insufficiency of the evidence (addressed below). Mr. White acknowledges that "the merits of this claim [regarding the closing argument] turn on this Court's rulings on Claim Nine."

Improper remarks by a prosecutor are grounds for *habeas* relief only if they are so prejudicial that they rendered the trial fundamentally unfair, either because they evinced

persistent and pronounced misconduct or because the evidence was so insubstantial that, in all

probability, no conviction would have occurred but for the prosecutor's remarks. *Hughes v.*

*Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008). Mr. White acknowledges that this was the

standard that was properly applied by the Court of Appeals, and further concedes that resolution

of this claim turns on the disposition of the following claim regarding sufficiency of the

evidence. Because, as discussed below, this Court finds no error in the Court of Appeals'

conclusion that there was overwhelming evidence of Mr. White's guilt, the Court finds that any

improper comments made by the prosecution in its closing argument – which is not necessarily

to say that this Court finds any of the cited comments inappropriate – did not prejudice Mr.

White. This claim for relief is without merit.

### 9. Sufficiency of the evidence

Mr. White claims that there was insufficient evidence presented to disprove his

contention that the shootings were done in self-defense. He points out that "evidence provided at

trial showed that the alleged victims were known drug dealers who were armed and that had

robbed Mr. White." He states that "one of the alleged victims went for his gun and Mr. White

shot him before he would be shot himself."

The Court of Appeals addressed Mr. White's sufficiency of the evidence claim by first

noting that, on such a claim, the evidence must be assessed in the light most favorable to the

prosecution. It noted that

> The People presented eyewitness testimony establishing that [Mr.
> White] was the aggressor and the sole shooter and that the thirteen
> shell casings found at the crime scene came from the same gun.
> No evidence was presented that either victim fired a weapon or
> that victim S.K., who was unarmed, ever reached for any of the
> weapons that were across from him in the bedroom. Although

38

> there was conflicting eyewitness testimony that victim D.J. had a
> weapon in the pocket of his pants, there was no evidence that he
> reached for his weapon.

On the strength of this evidence, the Court of Appeals concluded that "sufficient evidence was presented to disprove [Mr. White's] self-defense claim."[12]

Mr. White does not dispute these factual findings, but contends that "there was no evidence whatsoever that Mr. White did not act in self-defense." He contends that "there was evidence that both of the victims were known to be heavily armed and dangerous and that Mr. White was well aware of this fact." He further notes that "there was evidence of weapons being available to the victims" and that "it was clear that the victims had asked Mr. White to bring some $5,000 worth of cocaine for them to purchase and that they had no money with which to purchase said." From this, Mr. White believes that "it could reasonably be inferred that the victims attempted to jack Mr. White and he responded in self-defense."

Colorado's law on self-defense is found at C.R.S. § 18-1-704. A defendant is entitled to resort to physical force in order to defend himself "from what he reasonably believes to be the . . . imminent use of unlawful physical force by that other person." C.R.S. § 18-1-704(1). Where deadly physical force is used in defense, the defendant must reasonably have been in fear of an "imminent danger of being killed or of receiving great bodily injury." C.R.S. § 18-1-704(2)(a). Neither the statute nor Colorado caselaw supplies a specific definition of the term "imminent." *People v. Yaklich*, 833 P.2d 758, 760 (Colo. App. 1991). In cases interpreting the self-defense

---

[12]The Court of Appeals appears to agree with Mr. White that, under Colorado law, once a defendant raises a colorable claim of self-defense, the burden is on the State to prove, beyond a reasonable doubt, that the defendant did <u>not</u> act in self-defense. For purposes of Mr. White's sufficiency of the evidence claim, this Court will thus assume that the State bore the burden of proof on this issue.

statute, however, the Colorado courts have construed that term somewhat narrowly.

Most illuminating is *People v. Laurson*, 15 P.3d 791, 794-95 (Colo. App. 2000).  There, the defendant had previously met with a group of drug dealers for the purpose of making a purchase, but the dealers robbed him instead.  The defendant sought revenge, arranging for an acquaintance to meet dealers in a parking lot under the pretense of completing another drug deal. Instead, the dealers began assaulting the acquaintance.  When the defendant arrived at the parking lot, the group of dealers fled.  The defendant chased after the group and shot two of the dealers in the back.   At trial, the defendant sought an instruction to the jury on self-defense, but the trial court refused, finding that the evidence did not justify a reasonable belief by the defendant "that he needed to use force to protect himself against the use of force."  The court acknowledged that there was evidence that the defendant was concerned that the dealers might be armed, but noted that "this belief, either by itself or in conjunction with other evidence, does not establish a reasonable belief that the use of physical force against defendant was actually about to occur."  *Id.* at 795.  Similarly, the court rejected an argument that a fear of imminent injury was reasonable because he knew "the victims had a character for aggression and liked to fight."  The court found that "character evidence concerning the victims is also insufficient to establish a reasonable belief that unlawful physical force was about to be used against defendant . . . given the flight of the victims' group."  *Id.* at 795.  The court concluded that the defendant may have been entitled to an instruction regarding defense of another, but that the evidence "is insufficient to support a self-defense instruction in a case where, as here, there is no evidence that any member of the victims' group acted aggressively toward defendant."  *Id.*

From *Laurson*, this Court can derive certain insight into the meaning of the term

"imminent" in Colorado's self-defense statute.  A threat of harm cannot be imminent absent the victim "act[ing] aggressively" toward the person claiming the need to act in self-defense.  *Id.* *Laurson* makes clear that facts such as the victim being armed or the victim having a reputation for violence are, of themselves, insufficient to give rise to the right to act in self-defense; otherwise, the defendant in *Laurson* would have been entitled to a self-defense instruction notwithstanding the victims' failure to act aggressively towards him, as it was undisputed that the victims otherwise possessed these characteristics.  It is entirely logical to limit the scope of the term "imminent" to those harms that are "about to occur" as evidenced by "aggresive[ness]" towards a defendant.  *Id.*  To attenuate the meaning of "imminent" further would expand the scope of self-defense beyond all reasonable limits.  For example, Mr. White's contention that he reasonably believed that harm was imminent simply because he knew the victims had a reputation for violence and were known to be carrying (or have ready access to) weapons would suggest that he could have been acting in self-defense had he shot both victims the moment they opened the door to the house.  In such a circumstance, all Mr. White's predicates for self-defense were present – the victims' reputation preceded their opening of the door, as did their possession of or access to weapons – even though the victims had given no indication that they were about to harm Mr. White.

Without the necessity of the victim initiating an aggressive physical act triggering the right to act in self-defense, there is no temporal connection between the threat of harm and the defensive act.  Such a rule would negate the holding of *Yaklich*, 833 P.2d at 763.  There, a woman claiming to have suffered severe physical abuse at the hands of her husband hired men to kill him.  Charged with murder, the woman sought to raise self-defense, arguing that she

41

believed that she was in imminent danger of being injured or killed by a future episode of abuse. The Colorado Court of Appeals reversed the decision of the trial court to give a self-defense instruction in such circumstances, holding that a definition of "imminent" that included harm that was "impending, but not immediate" was improper. *Id.* Under Mr. White's conception of the term "imminent," the defendant in *Yaklich* should have received the requested instruction – she believed that her husband had a propensity towards violence and, presumably, believed he had ready access to weapons capable of causing severe injury (if nothing else, his fists). Mr. White's rule would thus suggest that the woman was free to kill her husband during a peaceful interlude, simply because it was <u>possible</u> that he might choose to harm her at some indeterminate point in the future.

Under existing Colorado precedent, this Court cannot say that the evidence against Mr. White, when taken in the light most favorable to the State, supports any reasonable doubt with regard to Mr. White's claim of self-defense. According to the undisputed findings of fact by the Court of Appeals, neither of Mr. White's victims brandished or even reached for a weapon before Mr. White shot them. Without an aggressive move by either victim, no reasonable juror could have concluded that Mr. White reasonably believed a threat of harm to him was imminent. Accordingly, the Court of Appeals' conclusion that there was substantial evidence to support the verdict against Mr. White was a correct application of the law to the facts, and Mr. White is not entitled to relief on this claim.

10. <u>Cumulative error</u>

Mr. White argues that, even if none of his claims of error are sufficient to support relief in their own right, the accumulation of those errors combined to render his conviction

unconstitutional.

The cumulative error doctrine "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Young v. Sirmons*, 551 F.3d 942, 972 (10th Cir. 2008). In the *habeas* context, the doctrine operates to aggregate only those constitutional errors that proved harmless; it does not take into account errors of state law that do not rise to constitutional level. *Id.*

This Court finds no merit in Mr. White's claim of cumulative error. As noted by the Colorado Court of Appeals – an observation this Court agrees with – the record, when properly taken in the light most favorable to the State, overwhelmingly supports a verdict of guilt against Mr. White. What constitutional errors there may have been – which is not to say that this Court finds any – are far too insignificant to have affected the verdict against Mr. White in light of such overwhelming evidence. Accordingly, this claim is without merit.

11.  Ineffective assistance of trial counsel

Although somewhat temporally displaced in the analysis, Mr. White's final claim asserts that his trial counsel was ineffective for two reasons: (i) counsel failed to elicit certain evidence at trial, such as the fact that the victim's girlfriend had moved bodies and hid one of the victim's guns from the police, the fact that there was gunshot residue on a victim's hand, or the fact that additional shell casings were found by a witness "several days after the shooting"; and (ii) counsel failed to adequately challenge the introduction of Mr. White's 2000 illegal discharge conviction, in that counsel failed to have counsel from the 2000 case testify at the hearing regarding exclusion of that conviction.

43

Unlike each of the prior claims, which were presented by Mr. White to the Colorado Court of Appeals on direct review, this claim was presented through a post-conviction motion under C.R.Cr.P. 35. The trial court denied this motion, apparently on the grounds that the claims therein had previously been raised and rejected. The Colorado Court of Appeals affirmed in a order dated September 10, 2009, albeit on different grounds. The Court of Appeals' decision disagreed that Mr. White's claims on direct appeal had been framed in the context of ineffective assistance of counsel (rather than the appointment of conflicted counsel), but concluded that the denial of the motion on its merits was nevertheless appropriate. With regard to the various claims that Mr. White's counsel failed to adequately explore certain areas at trial, the Court of Appeals found that his co-defendant's counsel fully explored each area with the relevant witnesses. Because the evidence Mr. White wished to have introduced was properly before the jury, regardless of who developed the record, the Court of Appeals concluded that Mr. White could not show that any ineffectiveness by his counsel caused him to suffer any prejudice. With regard to the claim that his counsel was ineffective in presenting evidence to support the request to exclude the 2000 illegal discharge conviction, the Court of Appeals found that Mr. White's counsel "highlighted several perceived deficiencies in prior counsel's performance," but that the trial court "found that the prior counsel's strategy was effective because he was acquitted of two attempted murder charges." Thus, the Court of Appeals concluded, Mr. White "fails to demonstrate how the [request to exclude the conviction] would have been any different had defense counsel called additional witnesses to provide the same information."

To the extent the discussion *supra* does not dispose of this claim, this Court finds no merit in Mr. White's contentions. The Colorado Court of Appeals properly applied the

*Strickland* analysis to this claim and correctly concluded that, with regard to the contention that trial counsel failed to adequately inquire of certain matters with trial witnesses, any such error was harmless because his co-defendant fully explored those areas.  Mr. White does not dispute that his co-defendant's counsel addressed each of these matters, nor does he offer any explanation as to why his own counsel's exploration of these matters would not simply have been cumulative.  Moreover, the Court notes that a review of Mr. White's closing argument reveals that his counsel specifically addressed and highlighted the very issues Mr. White references: *e.g.* "They had information from the very beginning that Tonya moved the gun"; "There were additional shell casings found on April 2nd."

With regard to his trial counsel's failure to call his prior counsel from the illegal discharge case to testify in support of excluding that conviction, this Court again finds that the Colorado Court of Appeals properly applied the *Strickland* analysis and properly concluded that any error by Mr. White's trial counsel was harmless.  Mr. White has come forward with no evidence to demonstrate that calling prior counsel to testify would likely have changed the outcome; indeed, Mr. White has not proffered an affidavit or any other evidentiary material that would indicate that his prior counsel's testimony would have been favorable to him.  At best, the Court has only Mr. White's <u>speculation</u> that his prior counsel, if called to testify at the hearing, would have admitted to having failed to render effective assistance in the 2000 illegal discharge case.  Mr. White's sheer supposition on this point is insufficient to carry his burden of demonstrating that the outcome of the proceeding to exclude the prior conviction would have been different had his trial counsel performed differently.

Accordingly, Mr. White is not entitled to relief on this claim.

## CONCLUSION

For the foregoing reasons, Mr. White's Amended Petition (# 7) is **DENIED** in its entirety on the merits. The Court has *sua sponte* considered whether a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c) is warranted, and the Court finds that none of Mr. White's claims make a substantial showing of a denial of a constitutional right under the standard of *Slack v. McDaniel*, 529 U.S. 473 (2000). Accordingly, the Court **DENIES** Mr. White a Certificate of Appealability.

Dated this 14th day of November, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

46